UNITED STATES DISTRICT COURT

SOUTHERN   DISTRICT   OF   TEXAS
HOUSTON DIVISION

Nathan Ochsner, Clerk

United States Courts
Southern District of Texas
F I L E D

NOV 1 3 2024

Nathan Ochsner, Clerk of Court

| | | |
|---|---|---|
| CONCEPCION VARGAS,<br>*Plaintiff*, | §<br>§<br>§ | |
| v. | §<br>§ | CIVIL ACTION NO. 4:23-CV-04267 |
| ALEJANDRO SALAZAR, ET AL.,<br>*Defendants*. | §<br>§ | |

## THE SECOND AMENDED COMPLAINT TO THE MAGISTRATE JUDGE'S PROPOSED

Pursuant to Rule 15 of the Federal Rules of Civil Procedure, the complaint is hereby amended at the request of the magistrate as of November 13, 2024. Specifically, the following sections of the Memorandum:

### FIRST SECTION

I.      The FLSA

       A. Disclosure of Tip Credit Pay Format.

       B. Tip Pooling with Non-tipped Employees.

       C. Requiring Work Outside of Plaintiff's Tipped Occupation.

       D. Overtime Violation.

       E. FLSA Retaliation.

       F. Dual Jobs.



## THIRD SECTION

III.   Economic Claims Under the FLSA and Texas Labor Code
    A. Disclosure of Tip Credit Pay Format
    B. Tip Pooling with Non-tipped Employees
    C. Requiring Work Outside of Plaintiff's Tipped Occupation
    D. Overtime
    E. Retaliation/Wrongful Termination
    F. Interest
    G. Legal Expenses
IV.    Conclusion

**FIRST SECTION**

**I.    The FLSA**

**A. Disclosure of Tip Credit Pay Format**

1. Defendants failed to inform me of the relevant statutory provisions for determining the cash wage an employer must pay a tipped employee under the FLSA.

2. Defendants failed to inform me of the additional amount that must be added to my base wages because of the tip credit claimed by the employer.

3. Defendants failed to inform me that all tips I received were to be retained in full by me, except in cases of a tip pooling arrangement limited to employees who customarily and regularly receive tips.

4. Although Defendants claim that they informed me of these provisions, they did not provide me with any documents or evidence to support this claim, such as a document signed by me indicating receipt of such information.

5. Specifically, I did not receive any document informing me about the employer's obligations to comply with the aforementioned provisions. There are, of course, other conditions for tip-credit eligibility. Of particular pertinence for present purposes, the employer must inform the employee in advance that it intends to count a portion of the employee's tips toward the required minimum wage. ███████████████████ This notice provision is strictly construed and normally requires that an employer take affirmative steps to inform affected employees of the employer's intent to claim the tip credit. ████████████████████████ ████████████████████████████ ██████████████████████ It is the employer's burden to show that it has satisfied all the requirements for tip-credit eligibility. ████

3

██████████████████████████████████

████ A failure to satisfy any of these requirements exposes the employer to liability for wages owed as well as liquidated damages. See U.S.C. §§ 215-16.

6. 6. The employer illegally took the tip credit by paying a wage of $2.13 USD per hour. Therefore, the Defendants, by failing to comply with the regulations pursuant to the FLSA, codified at 29 USC § 203(m)(2)(A) detailed at 29 CFR §§ 531.50(b) and 531.59(b), have violated the following provision: an employer is not eligible to take the tip credit unless it has informed its tipped employees in advance of the employer's use of the tip credit of the provisions of section 3(m)(2)(A) of the Act, and that the tip credit shall not apply to any employee who has not been informed of the requirements in this section.

7. The Defendants intentionally and willfully failed to inform me of the existence and application of the tip credit. This act of bad faith can be demonstrated because my case is not an isolated incident, but rather a common practice by employers to keep information about the tip credit hidden. From the moment of hiring, the Defendants have demonstrated a clear intention to not inform servers of their rights, thus allowing them to be coerced and subjected to labor abuses. By failing to disclose tip credit, employers create a false perception in server employees that there is no formal employment contract or labor rights, causing servers to mistakenly believe that they are merely receiving a "favor" by being able to take tips from diners. This deliberate deception perpetuates an exploitative environment where employees feel forced to accept abusive working conditions under the implicit threat of losing their jobs.

4

## B. Tip Pooling with Non-tipped Employees

1.  1. The Defendants forced me to share part of my tips with the "Busser", the "Runner" and the Bartender in violation of the regulations of 29 USC § 203(m)(2)(B) detailed in 29 CFR §§ 531.50 (c) and 531.52(a), which establishes that provides that an employer may not keep tips received by its employees for any purposes, including allowing managers and supervisors to keep any portion of employees' tips, regardless of whether the employer takes a tip credit under section 3(m)(2)(A).

2.  Due to the previous violations, the Defendants have alleged that the Fair Labor Standards Act (FLSA) permits the pooling of tips into a common fund. However, the Defendants failed to establish a tip pool among employees in a manner that complies with the requirements of the FLSA and associated regulations. Under 29 CFR § 531.54(a), in order for an employer to redistribute tips among employees through a common fund, there must be a "mutual agreement" among all affected employees, as well as reporting and reporting of that common fund. This mutual agreement is an essential requirement for the legitimacy of tip pooling under the FLSA. To prove that they did not violate this regulation, the Defendants would have to submit written proof containing my signature and the signatures of all participants in that purported "mutual agreement" for tip pooling into a common fund, as well as weekly or monthly reporting and reporting of that common fund. The absence of such a document is indicative that no such agreement existed, and consequently, any redistribution of tips without such an agreement constitutes a direct violation of the FLSA. ████████

████████████████████████████████████████

████ the redistribution of tips without the mutual agreement of the affected

employees is a violation of the FLSA. ██████████████ "an employer may not simply impose a tip pool system without the informed consent of the employees." ███████████████████████████ ████████████████████████████████████████ the lack of evidence of a mutual agreement to tip pooling invalidated the legitimacy of the employer-created tip pool.

3. The Defendants would also be in violation of 29 CFR §531.54(c)(1) which states that an employer may require an employee for whom the employer takes a tip credit to contribute tips to a tip pool "only if it is limited to tipped employees." The Busser and the Runner are not on the tip credit form, they were paid a salary, so they should not be included in a pool that is limited to tipped employees.

4. Definition of tipped employee:

   29 CFR § 531.56 (a) states that an employee who receives tips, within the meaning of the Act, is a "tipped employee" under the definition in section 3(t) of FLSA when, in the occupation in which he is engaged, the amounts he receives as tips customarily and regularly total "more than $30 a month." An employee employed in an occupation in which the tips he or she receives meet the minimum standard in the preceding sentence is a "tipped employee" for whom the wage credit provided by section 3(m)(2)(A) may be taken. 29 CFR § 531.56 (c) states that an employee must him- or herself customarily and regularly receive more than $30 a month in tips in order to qualify as a tipped employee. The fact that he or she is part of a group which has a record of receiving more than $30 a month in tips will not qualify him or her. 29 CFR § 531.56 (d) states that more than $30 a month in tips customarily and regularly received by the employee is a minimum standard that must be met before any wage credit for tips is

determined under section 3(m)(2)(A).  29 CFR § 531.57 states that the employee must receive more than $30 a month in tips "customarily and regularly" in the occupation in which he is engaged in order to qualify as a tipped employee under section 3(t).  On the other hand, an employee who only occasionally or sporadically receives tips totaling more than $30 a month, will not be deemed a tipped employee. The phrase "customarily and regularly" signifies a frequency which must be greater than occasional, but which may be less than constant.

5. Defandants can impose a tip pool but only if they pay the full minimum wage and do not take the tip credit, thus also violating regulation 29 CFR §531.54 (d) which states that an employer that pays its tipped employees the full minimum wage and does not take a tip credit may impose a tip pooling arrangement.

6. The Defendants required me to distribute $10.00 to the Bartender, $5.00 to the Runner, and $10.00 to the Busser or 2% of the customer's bill consumption amount daily, which violates the guidelines for determining the wage an employer must pay a tipped employee, and the guidelines for pooling tips into a common fund 3(m)(2)(A) 29 CFR §§ 531.50 and 531.54(c)(2). In addition, § 531.55(a) states that a compulsory charge for service, such as 15 percent of the amount of the bill, imposed on a customer by an employer's establishment, is not a tip and, even if distributed by the employer to its employees, cannot be counted as a tip received in applying the provisions of sections 3(m)(2)(A) and 3(t). Therefore, the 2% of the amount of the client's invoice that I was forced to share with the Busser cannot be considered as a tip within the tip credit, so the employer cannot force it to be shared even if there was a common fund.

## C. Requiring Work Outside of Plaintiff's Tipped Occupation

1. The Defendants ordered me to perform work that is not part of the tipped occupation and does not provide customer service. Which included washing, cleaning and stocking: bean bin section, Big Trays, Tea machine and bins. As well as preparing Tea in the large bin at the service station, supplying ice to the bins in the service aisle, washing and polishing cutlery, cutting various types of fruit to supply to the Bartender, from whom I do not receive any kind of tip, bonus or tip pool to justify this work for his station. Also supervision and administration work for the other servers which included: making a list of occupations for each Server, assigning them a task and supervising their compliance throughout the shift, which was required of me at the same time that I was doing my job as a Server, then at the closing of the restaurant, again assigning them tasks, supervising the work of each one and at the end checking them to allow their signed out, so I had to wait for all of them even though I had already finished my job. The breakdown of times can be found in "Exhibit C1" of this document. Therefore, the Defendants would be violating the FLSA in accordance with the following regulations:

   - 29 CFR §531.56(5)(i)(ii). Work that is not part of the tipped occupation is any work that does not provide service to customers for which tipped employees receive tips and does not directly support tip-producing work. If a tipped employee is required to perform work that is not part of the employee's tipped occupation, the employer may not take a tip credit for that time. The following examples illustrate work that is not part of the tipped occupation because the work does not provide service to customers for which tipped employees receive tips and does not

directly support tip-producing work. This list is illustrative and is not exhaustive. Preparing food, including salads, and cleaning the kitchen or bathrooms, is not part of the tipped occupation of a server.

- 29 CFR §531.56 (f)(1)(i)(2)(i)(ii) An employer may only take a tip credit for work performed by a tipped employee that is part of the employee's tipped occupation. Work that is part of the tipped occupation is Work that produces tips. Tip-producing work is any work performed by a tipped employee that provides service to customers for which the tipped employee receives tips. A server's tip-producing work includes providing table service, such as taking orders, making recommendations, and serving food and drink. A bartender's tip-producing work includes making and serving drinks, talking to customers at the bar and, if the bar includes food service, serving food to customers. A service bartender's tip-producing work includes preparing drinks for table service. A busser's tip-producing work includes assisting servers with their tip-producing work for customers, such as table service, including filling water glasses, clearing dishes from tables, fetching and delivering items to and from tables, and bussing tables, including changing linens and setting tables.

2. Despite the above definitions setting out the requirements for tip credit work, the Defandants argue that the above is support work, but it does not meet the guidelines for that category. In any event, if they were to be classified under the tip credit as support work, they would violate the substantial time standard of 20% of the workweek and the 30 continuous minutes standard. The violations are pursuant to:

9

- 29 CFR §531.56 (3)(i)(ii) Directly supporting work is work performed by a tipped employee in preparation of or to otherwise assist tip-producing customer service work. The following examples illustrate tasks that are directly supporting work: A server's directly supporting work includes dining room prep work, such as refilling salt and pepper shakers and ketchup bottles, rolling silverware, folding napkins, sweeping or vacuuming under tables in the dining area, and setting and bussing tables. A busser's directly supporting work includes pre- and post-table service prep work, stocking the busser station, and vacuuming the dining room, as well as wiping down soda machines, ice dispensers, food warmers, and other equipment in the service alley. A bartender's directly supporting work includes work such as slicing and pitting fruit for drinks, wiping down the bar or tables in the bar area, cleaning bar glasses, arranging bottles in the bar, fetching liquor and supplies, vacuuming under tables in the bar area, cleaning ice coolers and bar mats, making drink mixes, and filling up dispensers with drink mixes.

- 29 CFR §531.56 (4)(i) Substantial amount of time. An employer can take a tip credit for the time a tipped employee spends performing work that is not tip-producing, but directly supports tip-producing work, provided that the employee does not perform that work for a substantial amount of time. The employer cannot take a tip credit for any time spent on directly supporting work that exceeds the 20 percent tolerance.

- 29 CFR §531.56 (4)(ii) states that if a tipped employee performs directly supporting work for a continuous period of time that exceeds 30 minutes, the employer cannot take a tip credit for any time that exceeds 30 minutes. The Defendants ordered me to perform work at the end of the shift that exceeded the 30 continuous minutes required. The tasks

10

were a mix of support work such as sweeping under tables, rolling silverware, preparing tables. Other work that is not part of the tip credit such as: doing one of the Side Duties, washing and polishing silverware and the Server supervision tasks described above. The Side Duties are washing and cleaning the tea vending machine, food containers and Big and Small Trays, activities also described above and which can be consulted in "Exhibit C1" to review their classification and breakdown. These activities ranged between 40 and 60 continuous minutes in duration after the restaurant closed.

3.  The Defendants imposed that payment for the supervisory and administrative activities of the other Servers (Shift Leader) be paid with food and excluding beef dishes. The activities included: making a list of occupations for each Server, assigning them a task, supervising their compliance before and after the shift, and at the end reviewing them to allow their signed shift exit. The Defendants rotated the wait staff during the days of the week so that each one performed these tasks on an assigned day, with the objective of evading the corresponding payments for said activities, since they do not have a dedicated staff for these purposes, a practice very similar to the one they do with cleaning jobs, where they use the waiters to evade their salary responsibilities for that concept, since they do not have that dedicated staff either. Therefore, in accordance with the FLSA 29 U.S.C. They would also be violating 29 CFR §§ 531.28 and 531.33 which state that section 3(m) of the Act and subpart B of this part accordingly prescribe certain limitations and safeguards which control the payment of wages in other than cash or its equivalent, as well as the establishment of fair and reasonable value. (Special recordkeeping

requirements must also be met. These are contained in part § 516 of this chapter.)

**D. Overtime Violation**

1. The overtime claims are based on time worked after the restaurant closed, which would be specified as follows:

$$\text{After shift work} = 50 \text{ average daily minutes}$$
$$= 0.8 \text{ hours per day}$$
$$= 4.8 \text{ hours per week on average}$$

Work within the shift $= 38$ hours per week on average

$(40 \text{ hours}) - (38 + 4.8) = 2.8$

Resulting overtime $= 2.8$ hours per week

Therefore, I worked 40 hours per week, plus 2.8 hours of overtime per week that the Defendants did not pay me. Pursuant to the provisions of the FLSA, 29 U.S.C. § 207(a)(1), the Defendants would be in violation of this provision for the 47 weeks worked at the restaurant (June 14, 2022 – May 10, 2023). The calculation of the amount will be detailed in the claims section, where the compensation corresponding to the payment of overtime owed will be included, at a rate of not less than one and one-half (1.5) times the regular rate of pay.

## E. FLSA Retaliation

### Factual allegations (Background)

On the day of the incident, Wednesday, May 10, 2023 (evening shift), the cause of the conflict was the unequal distribution of tables (tips). Mr. Alejandro Salazar was not at the establishment, so when the discussion occurred with his manager, Yadira, I sent him the following text message to his cell phone to report the incident: "Hi Alex, Sorry Alex, your managers don't respect me as a server, I'm not going to work like that." Message recorded and attached in the annexes. Mr. Alejandro Salazar did not respond, so I decided to go home that day. The next day, Thursday, May 11, 2023 (afternoon shift), I showed up in my uniform for work, but first I wanted to speak with Mr. Alejandro Salazar directly to offer him one last opportunity to correct his irresponsibility, and once again I reported to him what happened the day before about the improper practices of the distribution of tables (tips) and the verbal abuse, but Mr. Salazar decided to fire me, his argument was that I did not finish my shift and that I left my tables, because I went to my house the day before, and that it was a company policy, of course I could not stay that day and allow them to continue violating my person, or allow them to continue arbitrarily stripping me of tables with my salary at stake, an practice that I denounced repeatedly and that that day I tried to stop with my protest by abandoning the shift. Furthermore, Mr. Alejandro Salazar tried to coerce me into signing a document without my consent, which I believe was to evade his legal responsibilities. The unjustified dismissal consequently led to unemployment, emotional stress and the loss of my savings. Defendant mentions that Plaintiff Concepcion Vargas (employee): *"on or about May 11, 2023, she left the restaurant in the middle of her shift and that Defendants did not hear from*

13

*Plaintiff again until she filed her state court complaint on October 16, 2023."*
Which is incorrect.

There is a precedent that was the flashpoint. On one occasion, a group of 20 customers entered my assigned section. These types of tables are the most coveted among the wait staff because they are equivalent to a higher tip. When I was about to serve them, Alejandro Salazar called me to his office and told me that I could not serve the table alone, that I had to share it with one of the waiters. I explained to him that I did not have any additional tables and that in the past I and the rest of the waiters have served that number of people alone, but he refused and argued that it was a new rule. The other waiter he assigned to me, named Elias, did have tables to serve, so he was busy serving his tables and did not come to my section. Alejandro Salazar wrongly interpreted this as disobedience on my part, so he called me back to the office and told me "I expect you to obey the rule." Under this threat, I returned to my section. The Server Elias never helped me serve the table of 20 people, however I was forced to give him half of my tips. A few days later a Server named Esmeralda served a table of 20 people by herself, breaking the supposed new rule implemented by Alejandro Salazar, just to cite an example. Since that incident Alejandro Salazar changed his attitude unfavorably towards me significantly, because he observed my dissatisfaction with the distribution and assignment of tables. From that moment on, on repeated occasions, the discussions became more frequent because I made him and his managers aware of my dissatisfaction with the inequitable distribution and assignment of tables for the costumers.

# Analysis

1. For the purposes of this claim, the FLSA does not contain a specific definition of "protected activity" and its interpretation is variable. See Simon ex rel. Fla. Rehab. Assocs., PLLC v. Healthsouth of Sarasota Ltd. P'ship, 2022 WL 3910607 (11th Cir. Aug. 31, 2022), a recent case that highlights this complexity. For example under Title VII an employee only needs a good faith, objectively reasonable belief that the employee's activity is protected by Title VII to be protected conduct under the Act. See Little v. United Techs., Carrier Transicold Div., 103 F.3d 956, 960 (11th Cir. 1997). Title VII's anti-retaliation provision does not require an employee to show that the employer's conduct violated Title VII. In another case under the False Claims Act (FCA), the Eleventh Circuit clarified that an employee must show an objectively reasonable belief that the employer was violating the FCA. See Hickman v. Spirit of Athens, Alabama, Inc., 985 F.3d 1284 (11th Cir. 2021). This objectively reasonable belief standard for "protected activity" in FCA retaliation claims is an approach consistent with surrounding Circuits. In the Fourth Circuit, for example, "an act constitutes protected activity where it is motivated by an objectively reasonable belief that the employer is violating, or soon will violate, the FCA." U.S. ex rel. Grant v. United Airlines, Inc., 912 F.3d 190, 201 (4th Cir. 2018). there are also different standards under state laws. In Florida, for example, the courts are split on whether employees alleging a violation of the Florida Whistleblower Act (FWA) must show that an employer "actually violated the law" or whether the employee must only show that he or she had a "good-faith, reasonable belief" that the employer had violated a law, rule, or regulation. See United States ex rel. Els v. Orlando Heart & Vascular Center, LLC, 2022 WL 4483723 (M.D. Fla. Sept. 27, 2022). Florida's

15

Fourth District Court of Appeal has held that all that is required under the FWA is that an employee have "a good faith, objectively reasonable belief that [his or her] activity is protected by the statute." Aery v. Wallace Lincoln-Mercury, LLC, 118 So. 3d 904, 916 (Fla. 4th DCA 2013). This is the same standard for Title VII retaliation claims.

2. To state a claim for retaliation under the FLSA, the plaintiff must allege engagement in "protected activity" under the FLSA. 29 U.S.C. § 215(a)(3) states that discharge...any employee because such employee has filed a complaint or instituted or caused to be instituted a proceeding under or "relating to" this chapter. Pursuant to 29 U.S.C. § 218c(a)(2)(5): No employer shall discharge...any employee with respect to his or her "compensation," terms, conditions, or other privileges of employment because the employee... has— provided...the employer with information relating to any violation, or any act or omission which the employee "reasonably believes to be a violation," of any provision of this title (or an amendment made by this title); objected to, or refused to participate in, any activity, policy, practice, or assignment which the employee "reasonably believes" to violate any provision of this title (or amendment), or any order, rule, regulation, standard, or prohibition under this title (or amendment). Additionally, 29 U.S.C. § 218c(b)(1)(2) provides that an employee "who believes" that he or she has been discharged... by any employer in violation of this section may seek relief in accordance with the procedures. Nothing in this section shall be deemed to diminish the rights, privileges, or remedies of any employee under any federal or state law or under any collective bargaining agreement. The rights and remedies of this section may not be waived by any agreement, policy, form, or condition of employment.

16

3. To file a retaliation claim under the FLSA, the plaintiff must allege an adverse action and a causal link between the activity and the adverse action. The link between the adverse action and the activity is that: one day after I voiced my complaint to Alejandro Salazar, he fired me the next day. There are witnesses to this type of internal conflict that constantly occurs due to the inequitable distribution of tips, and that day his manager Yadira participated in that discussion. In addition to her, there are witnesses to the incident that day, there is also a telephone message that proves my complaint filed with Alejandro Salazar which was attached to the initial petition. The restaurant has a video monitoring system that can prove the incident, as well as prove that I showed up to work the next day in my regulation uniform and arrived an hour before my shift started, there are also witnesses to that. I met with Alejandro Salazar at his office, he did not send anyone on his behalf, he fired me personally, we talked about the conflict of the previous day, which is basically a problem that arises every day, and he fired me under the pretext that I left my shift the day before and that it was "company policy", I explained to him that he had not answered my message and that I could not stay. Because when these altercations happen they are always accompanied by verbal aggression, arguments and intimidation towards me, in addition to seriously affecting my salary. Therefore, the dismissal was due to the conflict of the previous day and the complaint that he decided not to answer, he ignored my message, an attitude that was also constant every time I expressed my complaints not only about the illegal distribution of tips, but even for physical aggression, i.e. I did not leave my job as the Defendants stated in their motion to dismiss, arguing that I left and that they did not hear from me again.

17

F. Dual Jobs

    1. Claims for activities related to Shift Leader were restructured and included in the previous section: "C. Requiring Work Outside of Plaintiff's Tipped Occupation".

**SECOND SECTION**

**II.   Complementary Allegations**

**A. FLSA Wrongful Termination**

    1. The Defendants are violating Public Policy by firing me for filing a Complaint about Pay. When the employer's conduct is not specifically prohibited by a statutory or constitutional provision, the Courts have in practice issued judgments for Wrongful Termination that contravene Public Policy. See Sequoia Ins. Co. v. Norden, 158 Vt. 280, 608 A.2d 138 (Vt. 1993). This includes reporting employer misconduct, such as reporting unethical, unfair behavior that violates the fundamental principles and purposes of fairness and justice in the workplace.

    2. La The protection against wrongful termination in violation of Public Policy has been recognized in several court precedents. An employer's right to terminate an employee at will is subject to limits imposed by fundamental public policy. See for summary judgment Green v. Ralee Engineering Co., 19 Cal. 4th 66 (1998). At-will employees may recover tort damages from their employers if they can show that they were fired in violation of fundamental Public Policy. Tameny v. Atlantic Richfield Co. (1980)27 Cal. 3d 167, 172 [164 Cal. Rptr. 839, 610 P.2d 1330, 9 ALR4th 314 based on Petermann v. International Brotherhood of Teamsters (1959) 174 Cal. App. 2d 184 [344 P.2d 25]. Both Tameny and Petermann relied on substantial public policy concerns

to limit the employer's right to fire, and subsequent cases have recognized similarly limited Public Policy violations for retaliatory discharge.

3. To define the "Public Policy" The Supreme Court says that it's unlawful to terminate anyone if the refuse to violate a state of (1) Federal Constitutional Provition (2) a state Federal Law or a statute and (3) certain Administrative Regulations which inner to the benefit of the public. If an employer fires a worker that contravenes something that is right and just and affects the citizens of the state collectively, that would violate Public Policy. The termination is unlawful if it was substantially motivated by the employee (1) complaining (2) reporting or (3) refusing to do something illegal. Some examples not exhaustive:

- If the employee complains about administrative irregularities and is fired for it, that would violate Public Policy.
- Dismissing an employee who left his position due to administrative irregularities, that would violate Public Policy.
- If the employee complains that he is not being paid adequate overtime, minimum wage, or mandatory breaks and is fired for the complaint, that would violate Public Policy.
- If the employee complains about an unsafe work environment and you are fired because of your complaint, that would violate Public Policy.
- If the employee works in sales and the company fires him to avoid having to pay you the commissions that correspond to him, that would violate Public Policy.
- If the employee reports his employer for doing something illegal and is fired for his report, that would violate Public Policy.

4. Fundamental Principles of Public Policy. Public policy protects employees who report unethical and bad faith practices within their company, as such protection is essential to maintaining the rule of law and respecting labor laws for the public benefit. Firing an employee for exercising his or her right to report these practices runs counter to these fundamental principles and should therefore be punished.

5. Wrongful termination is a common-law claim. Wrongful termination was first recognized in Washington state by the Supreme Court of Washington State in *Thompson v. St. Regis Paper Co., 102 Wn.2d 219, 685 P.2d 1081 (Wash. 1984)*.

6. The "at will" contract is an implied contract, which implies equitable sharing of tips and not coercing the employee's wages, because it would violate Public Policy. Therefore, filing a complaint against the employer for this practice and the employer failing to correct and then firing the employee for it, merits being disciplined.

























# THIRD SECTION

## III. Economic Claims Under the FLSA and ███████████

## A. Disclosure of Tip Credit Pay Format

1. The FLSA requires that in order for an employer to take the tip credit and pay an employee less than the federal minimum wage, the employer must provide the employee with advance notice of the use of the tip credit. If the employer fails to provide this information, the employer loses the right to use the tip credit. This means that instead of paying the reduced minimum wage that the tip credit allows, the employer is required to pay the full minimum wage to the employee and is subject to fines and civil penalties from the U.S. Department of Labor for violating the provisions of the FLSA. ███████████ ███████████████████████████████████ ███████████████████████████████████ ███████████████████████████████████ ███████████████████ failure to provide proper notice negates an employer's ability to use the tip credit. In the event that the employer has not properly informed the employee about the use of the tip credit, the employer must pay the affected employee:

- Retroactive Pay. If the employer took a tip credit without properly informing the employee, the employer could be required to retroactively pay the difference between the wages paid under the tip credit and the full minimum wage for each hour worked. 29 U.S. C. § 206(a).
- Liquidated Damages: Under the FLSA, the employer will be required to pay the employee an amount equal to the difference in wages as liquidated

32

damages, which effectively doubles the amount of back wages owed. 29 U.S.C. § 216(b).

2. 

3. Specifications for the calculation.

- Number of weeks elapsed from the start of employment (June 14, 2022) to the date of dismissal (May 10, 2023) not counting the training week = 47 weeks worked.
- Current minimum wage $7.25 USD.
- Salary received within the tip credit format $2.13 USD

Back Pay

[($7.25) − ($2.13) x (40 hours)] x [47 weeks worked] = $ 9,625.60

Liquidated Damages = Back Pay

Liquidated Damages = $ 9,625.60

## B. Tip Pooling with Non-tipped Employees

1. Wages diverted from my tips by the employer that were distributed to employees Busser, Bartender and Runner illegally.

Busser = $10.00 USD per day.

Bartender = $ $10.00 USD per day.

Runner = $ 5.00 per day.

Days worked per week = 6

$10.00 + $10.00 + $5.00 = ($25.00) x (6 days) = $150.00 per week

Back Pay

($150.00) x (47 weeks worked) = $7,050.00

Liquidate Damages = $7,050.00

**Subtotal B = $14,100.00 USD**

## C. Requiring Work Outside of Plaintiff's Tipped Occupation

1. Work that is not part of the tip credit and for which I was not paid. See "Exhibit C1."

2. 

Support Work = 3 hours per week

Work that is not part of the tip credit = 10.91 hours per week

Back Pay

(10.91 hours) x (47 weeks) = $ 512.77 x $ 7.25 = $ 3,717.59

Liquidated Damages = $ 3,717.59

## D. Overtime

1. Pursuant to FLSA 29 U.S.C. § 207(a)(1): Provides that hours worked in excess of 40 hours per week must be compensated at a rate of not less than one and one-half times (1.5x) the employee's regular rate of pay. Overtime hours worked at the end of the shift that were not paid to me are described in the "Overtime Violation" section above. Pursuant to 29 U.S.C. § 216(b): Provides that, in addition to back wages, the employer is liable to pay an equal amount in liquidated damages.

   Unpaid overtime = 2.8 per week

   Back Pay
   (2.8 hours) x (47 weeks) = [$131.60] x [($7.25) x (1.5)] = $1,431.15

   Liquidated Damages = $ 1,431.15

   **Subtotal D = $ 2,862.30 USD**

36

## E. Retaliation/Wrongful Termination

1. Lost wages and lost benefits (tips) from the termination of employment (May 10, 2023) until a mutual agreement is reached between the parties. For a prior estimated calculation, the date of submission of this document (August 2, 2024) = 69 weeks will be considered.

2. 

(Until November 8, 2024)

Lost wages and lost benefits = $ 600.00 per week

($600.00) x (78 weeks) = $ 46,800.00

Lost Wages for Unpaid Minimum Wage ($2.13 per Hour)

Under the FLSA, the employer was required to pay a minimum wage of $2.13 for each hour worked regardless of the amount of tips. This wage was not provided, so a total of

lost wages is claimed in the amount of $6,650.40 USD (calculated at a rate of $2.13 per hour for 40 hours per week for 78 weeks).

Liquidated Damages

The FLSA allows for liquidated damages equal to the total amount of unpaid wages, including both unpaid minimum wage and lost tips. In this case, the liquidated damages amount to

$$\text{Liquidated Damages} = \$\ 53{,}450.00$$

███████████████████████████████

                                    ███████████████████████

**F.** Unpaid minimum wage of $2.13 when taking tip credit.

· Back Pay: $4,004.40

· Liquidated Damages: $4,004.40

## G. Interest

Pursuant to 29 U.S.C. § 1961 (a)Interest shall be allowed on any money judgment in a civil case recovered in a district court. Execution therefor may be levied by the marshal, in any case where, by the law of the State in which such court is held, execution may be levied for interest on judgments recovered in the courts of the State. Such interest shall be calculated from the date of the entry of the judgment, at a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding the date of the judgment. The Director of the Administrative Office of the United States Courts shall distribute notice of that rate and any changes in it to all Federal judges.

(b) Interest shall be computed daily to the date of payment except as provided in section 2516(b) of this title and section 1304(b) of title 31 and shall be compounded annually.

(c)

(1) This section shall not apply in any judgment of any court with respect to any internal revenue tax case. Interest shall be allowed in such cases at the underpayment rate or overpayment rate (whichever is appropriate) established under section 6621 of the Internal Revenue Code of 1986.

(2) Except as otherwise provided in paragraph (1) of this subsection, interest shall be allowed on all final judgments against the United States in the United States Court of Appeals for the Federal circuit, at the rate provided in subsection (a) and as provided in subsection (b).

(3) Interest shall be allowed, computed, and paid on judgments of the United States Court of Federal Claims only as provided in paragraph (1) of this subsection or in any other provision of law.

(4) This section shall not be construed to affect the interest on any judgment of any court not specified in this section.

Interest = Pending

## H. Legal Expenses

Legal Expenses = Pending

## IV.    Conclusion

Defendants' violations of the Fair Labor Standards Act (FLSA) and the Texas Labor Code are of considerable gravity and require a thorough analysis that considers the joint application of both statutes. The provisions of the Texas Labor Code not only supplement the claims made under the FLSA but are crucial to ensuring a full and equitable remedy for the documented violations. Failure to address these state provisions could result in an insufficient judicial decision that does not encompass the full scope of the violations, leaving the plaintiff without adequate relief under the law. It is imperative that this court consider the violations described in both the FLSA ████████████████ ████████████████████████████████████████████████████████████ ███████████████ and the retaliation against the plaintiff following the filing of legitimate complaints. Ignoring these violations would result in an injustice that would perpetuate the harm suffered by the plaintiff. I therefore ask that this court not only recognize the violations detailed in this case, but also impose necessary and just remedies under the FLSA and ████████████████, ensuring that full justice is served, and that Plaintiff is compensated to the fullest extent possible for the damages inflicted by Defendants.

Respectfully submitted,



/s/

**Concepción Vargas**
1221 Redford Street, #1105C
Houston, Texas 77034-1963
Telephone: 806-410-8356
Email: conchis1312@hotmail.com
**PRO SE PLAINTIFF**

CERTIFICATE OF SERVICE

I hereby certify that on November 13, 2024, I physically filed the foregoing with the
Clerk of the Court using the CM/ECF system which will send notice of such filing to the
following persons:


_____/s/_____

**Megan M. Mitchell, ATTORNEY-IN-CHARGE**
State Bar No. 24073504
SDTX No. 24073504
mmmitchell@grsm.com
**GORDON REES SCULLY MANSUKHANI, LLP**
1900 West Loop South, Suite 1000
Houston, Texas 77027
Telephone: (713) 961-3366
Facsimile: (713) 961-3938

**ATTORNEYS FOR DEFENDANTS**


/s/ _____

**ConcepcionVargas**

## Exhibit C1
## Classification and breakdown of jobs

| Description | Type of work | Hours per week |
|---|---|---|
| Cut fruit (watermelon, strawberry, pineapple, etc.) for Bartman drinks. Twice a day, four days a week. | No tip credit | 2.66 |
| Cut green lemons for Bartman, 30 minutes duration, once a day, one day a week on average. | No tip credit | 0.5 |
| Cut yellow lemons for water and tea for diner drinks, 30 minutes duration, once a day, one day a week on average. | No tip credit | 0.5 |
| Supply ice in service aisle bins, 5 minutes, six times a day, one day a week on average. | No tip credit | 0.5 |
| Prepare tea in service aisle bin, 10 minutes, once or twice a day (average 1.5), one day a week on average. | No tip credit | 0.25 |
| Wash and polish silverware in hot water (approx. 40 pieces of knife and fork), 30 minutes a day, six days a week. Sweep diner tables during shift, 10 minutes, three times a day, six days a week. | No tip credit | 3 |
| Sweep diner tables during the work shift, 10 minutes, three times a day, six days a week. | Support work | 1 |
| Supply napkins during shift, 5 minutes, once a day, six days a week. | Support work | 0.5 |
| Sweep diner tables at end of shift, 10 minutes, once a day, six days a week. | Support work | 1 |
| Prepare silverware (approx. 40 pcs.), arrange in pairs: knife, fork and napkin, 10 minutes, once a day, six days a week. | Support work | 0.5 |
| Side Duty 1: Clean tea vending machine, wash tea containers at end of shift, 30 minutes, once a day, once a week. | No tip credit | 0.5 |
| Side Duty 2: Clean food section and bean containers, empty leftovers and store in refrigerator at end of shift, 30 minutes, once a day, four days a week. | No tip credit | 2 |
| Side Dutie 3: Wash Big Trays at the end of the shift, 30 minutes, once a day, one day a week. | No tip credit | 1 |

No Tip Credit = 10.91 hours

Support Work = 3 hours